'08 CIV 6447

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

MARLENE M. MASS and BARBARA BOYLAN, :
individually and on behalf of all others similarly :
situated, :
                                         :

             Plaintiffs, :
v. :

AMERICAN INTERNATIONAL GROUP, INC., :
David L. Herzog, AIG Retirement Board, :
John Does 1-10, American International Group, :
Inc. Board of Directors, Marshall A. Cohen, Martin :
S. Feldstein, Ellen V. Futter, Stephen L. :
Hammerman, Richard C.  Holbrooke, Fred H. :
Langhammer, George L. Miles, Jr., Morris W. :
Offit, James F. Orr III, Virginia M.  Rometty, :
Martin J. Sullivan, Michael H. Sutton, :
Edmund S.W. Tse, Robert B. Willumstad and :
Frank G. Zarb, :
                                         :

             Defendants. :

——————————————————— x

JUL 1 6 2008

Case No:

**CLASS ACTION COMPLAINT**

Plaintiffs, Marlene M. Mass and Barbara Boylan ("Plaintiffs"), individually, as

representatives of the AIG Incentive Savings Plan ("AIG Plan") and the American General

Agents and Managers' Thrift Plan ("AG Plan" and collectively with the AIG Plan, "Plans"), and

on behalf of a class of similarly situated participants in the Plans (the "Participants"), by their

attorneys, allege the following for their Complaint ("Complaint"):

## I. NATURE OF THE ACTION

1.       Plaintiffs, Participants in the Plans, bring this action against American

International Group, Inc. ("AIG" or the "Company") and others, individually, as representatives

of the Plans and on behalf of a class of all Participants in the Plans for whose individual accounts

the Plans invested in the AIG Stock Fund (the "Fund"), a non-diversified fund which invests in

AIG common stock, from May 10, 2007 to the present (the "Class Period").  Plaintiffs bring this

action on behalf of both the Plans and the Plans' Participants and beneficiaries pursuant to §

502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties owed to

the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29

U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these

breaches, Defendants are liable to the Plans for all losses resulting from each such breach of

fiduciary duty.  Plaintiffs also seek equitable relief.

3.      Plaintiffs' claims arise out of AIG's misrepresentations and failures to disclose

material adverse facts concerning the valuation of its super senior credit default swap ("CDS")

portfolio and its financial exposure arising out of "puts" it had written on certain collateralized

debt obligations ("CDO"), all of which were linked to the United States residential sub-prime

mortgage market.

4.      These improper activities artificially inflated the value of Fund and AIG stock

shares.  Yet, throughout the Class Period, the Plans continued to invest in the Fund and the Fund

continued to invest in AIG stock.

5.      Plaintiffs allege that it was imprudent to permit the Plans to invest in the Fund and

the Fund to invest in AIG stock because the prices of shares of the Fund and Company stock

were artificially inflated.  Plaintiffs also allege that Defendants breached their fiduciary duties by

negligently failing to disclose material information necessary for Participants to make informed

decisions concerning the Plans' assets and benefits and investing in the Fund.  Finally, Plaintiffs

allege that those Defendants who had a duty to appoint and monitor those fiduciaries with authority or control over Plans assets breached their duty to appoint and monitor.

## II. JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

7.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the Plans are administered, where the breaches took place and where one or more defendants reside or may be found.

## III. THE PARTIES

9.      Plaintiff Marlene Mass is a resident of the State of New Jersey and Plaintiff Barbara Boylan is a resident of the State of New Jersey.  Plaintiffs are  Participants in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

10.      Defendant AIG is a holding company organized under the laws of the state of Delaware with its executive offices located at 70 Pine Street, New York, New York.  AIG is the Sponsor and, on information and belief, a fiduciary of the Plans.  It engages in a broad range of financial services.

11.      Defendant AIG Retirement Board ("Committee") is, on information and belief, an unincorporated association and, according to the AIG Incentive Savings Plan Document, the Plan Administrator of the AIG Plan.  On information and belief, the Committee is the Plan Administrator of the AG Plan.

3

12.    Defendant Richard Grosiak ("Grosiak") is the Director of Employee Benefits for AIG. Grosiak is also a member of the Committee as evidenced by his signing as "Plan Administrator" both the AIG Plan's and the AG Plan's Form 5500 Annual Reports filed with the United States Internal Revenue Service ("IRS") both of which were dated October 11, 2007.

13.    Defendants John Does 1-10 are members of the Committee (together with Grosiak, "Committee Members") whose names are not currently known.

14.    Upon information and belief, the Committee Members were all AIG senior officers and employees who served on the Committee without additional compensation in the ordinary course of their employment and who exercised authority or control over the Plans, the Plans' assets and/or the Fund. This belief is based in part on the fact that Grosiak is AIG's Director of Employee Benefits. As a result of their senior positions within the Company, they knew or should have known all of the facts alleged herein.

15.    AIG's Board of Directors ("Board") had the duty to appoint and monitor the members of the Committee as evidenced by AIG's Form S-8 Registration Statement filed with the Securities and Exchange Commission ("SEC") on December 12, 2002. The Board as an entity and each of the following who were members of the Board during some or all of the Class Period are named as Defendants: Marshall A. Cohen, Martin S. Feldstein, Ellen V. Futter, Stephen L. Hammerman, Richard C. Holbrooke, Fred H. Langhammer, George L. Miles, Jr., Morris W. Offit, James F. Orr III, Virginia M. Rometty, Martin J. Sullivan, Michael H. Sutton, Edmund S.W. Tse, Robert B. Willumstad and Frank G. Zarb (collectively the "Director Defendants").

4

## IV.  DESCRIPTION OF THE PLANS

**The AIG Plan**

16.     The AIG Plan is an "employee benefit plan" within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A), and it is an "employee pension benefit Plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1 107(d)(3), and a "qualified cash or deferred arrangement plan" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

17.     The AG Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the AG Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account.  Consequently, retirement benefits provided by the AG plan are based solely on the amounts allocated to each individual's account.  According to the AG Plan's Form 11-K Annual Report filed with the SEC on June 28, 2004 ("AG Form 11-K"):

> Each participant's account is credited with the participants' and Company's contributions and an allocation of Plan earnings.   Allocation of Plan earnings is based on participants' account balances. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

18.     The AIG Plan is a voluntary contribution plan whereby Participants may contribute a portion of their eligible employment compensation to the AIG Plan ("Employee Contributions").  The Company matched certain participant contributions by making

5

contribution to the respective individual accounts ("Matching Contributions). According to the AG Form 11-K:

> Participants may contribute, on a pretax basis, a basic amount equal to three percent of base pay. Participants may also make additional pretax contributions in an amount ranging from one to fifty percent of base pay. All contributions are subject to the contribution limitations discussed below. The Company contributes an amount equal to one-third of the basic contribution

19.    Participants could direct the AIG Plan to invest AIG Plan assets held in their individual accounts among a number of Investment Options offered by the AIG Plan. Among the Investment Options which Participants could select for investment of their AIG Plan accounts was the Fund.

20.    The Company matched certain participant contributions by making contributions to the respective individual accounts ("Matching Contributions). The Matching Contributions were automatically invested in the Fund, though employees could later transfer the contributions out of the Fund.

21.    The assets of the AIG Plan are held in trust by the AIG Plan Trustee, Vanguard Fiduciary Trust Company ("Vanguard"), pursuant to a trust agreement executed between Vanguard and, on information and belief, AIG (the "Trust").

22.    The assets of the AIG Plan are held in trust by the AIG Plan Trustee, Vanguard Fiduciary Trust Company ("Vanguard"), pursuant to a trust agreement executed between Vanguard and, on information and belief, AIG (the "Trust").

## V. DEFENDANTS WERE FIDUCIARIES

23.    At all times relevant to this Complaint, Defendants were fiduciaries of the Plans because:

    (a)    they were so named; and/or

    (b)    they exercised authority or control respecting management or disposition of the Plans' assets; and/or

    (c)    they exercised discretionary authority or discretionary control respecting management the Plans; and/or

    (d)    they had discretionary authority or discretionary responsibility in the administration of the Plans.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

24.    In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

25.    A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

26.    The Committee and the Committee Members were fiduciaries because the Committee was the Named Fiduciary and Plan Administrator of the Plans. The Committee was responsible for managing the Plans on a day to day basis. Moreover, according to AIG's Form 5500, the Committee was the Plan Administrator of the AIG Select Fund Master Trust, the trust plan which owned all of the assets of the AIG stock fund. Accordingly, on information and belief, the Committee established guidelines for the Plans' investments and selected and monitored the investment options for the Plans, including the Fund. Upon information and belief, the Committee also directed the Plans' trustee concerning the investment of the Plans' assets. The Committee and the Committee Members were thus fiduciaries because they exercised authority or control over the management and disposition of plan assets.

27.    AIG was the Sponsor of the Plans. It is a fiduciary in that it managed, administered and operated the Plans, exercised authority or control over the management and disposition of plan assets and disseminated plan communications to Participants. In particular:

a.    On information and belief, the Committee delegated its responsibility for administering the Plans to non-committee employees of AIG. Pursuant to this delegation, AIG, in fact, administered the Plans.

b.    Upon information and belief, AIG, through its treasury, human resources, and legal departments, directed Vanguard concerning the investment of plan assets in the Fund and the Fund's assets in AIG stock.

c.    Upon information and belief, the Committee met infrequently and spent very little time on matters relating to administration of the Plans and the Plans' investments. Rather, upon information and belief, these jobs were performed by AIG employees acting in the

scope of their day to day duties and, in particular, by AIG human resources, legal, corporate communications, finance and treasury personnel. In particular, on information and belief, AIG employees monitored the Plans' investments and communicated with Participants concerning the Plans' investments and the risk and return characteristics thereof. This included, on information and belief, monitoring and communicating in regard to the Fund.

      d.    Upon information and belief, the Committee Members were appointed and served on the Committee as part of and in the ordinary course of their AIG job responsibilities without any additional compensation. Accordingly, the Company is responsible and liable for their actions.

      e.    AIG, through its Board of Directors, appointed the Committee Members and, therefore, is responsible for the appointment and monitoring of the Committee.

    28.    The Director Defendants were fiduciaries of the Plans because they had the fiduciary duty to appoint and monitor the members of the Committees as evidenced by AIG's December 4, 2002 Form S-8 Registration Statement. They had the power and responsibility to appoint as members of the Committees persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties as committee members, including the duty to evaluate the merits of investment options under the Plans. The Director Defendants also had an ongoing duty to ensure that the persons appointed to the Committee were fully informed and performing their duties properly with respect to the selection of investment options under the Plans and the investment of the assets of the Plans.

## VI. FIDUCIARY DUTIES UNDER ERISA

29.    **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

30.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty-- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

31.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

32.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

10

with such matters would use in the conduct of an enterprise of a like character and with like

aims. . . ."

33.    **The Duty to Inform.**  The duties of loyalty and prudence include the duty to

disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a

duty to convey complete and accurate information material to the circumstances of participants

and beneficiaries.  These duties to disclose and inform recognize the disparity that may exist, and

in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and

the Participants, on the other.

34.    Pursuant to the duty to inform, fiduciaries of the Plans were required under

ERISA to furnish certain information to Participants.  Defendants were required to furnish a

Summary Plan Description ("SPD") and a Prospectus to Participants.  The SPD, the Prospectus

and all information contained or incorporated therein constitutes a representation in a fiduciary

capacity upon which Participants were entitled to rely in determining the identity and

responsibilities of fiduciaries under the Plans and in making decisions concerning their benefits

and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of
> misleading, misinforming or failing to inform participants and beneficiaries. Any
> description of exceptions, limitations, reductions, and other restrictions of plan
> benefits shall not be minimized, rendered obscure or otherwise made to appear
> unimportant. Such exceptions, limitations, reductions, or restrictions of plan
> benefits shall be described or summarized in a manner not less prominent than the
> style, captions, printing type, and prominence used to describe or summarize plan
> benefits. The advantages and disadvantages of the plan shall be presented without
> either exaggerating the benefits or minimizing the limitations. The description or
> summary of restrictive plan provisions need not be disclosed in the summary plan
> description in close conjunction with the description or summary of benefits,

11

provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).  Here, on information and belief, Defendants purported to make that

required disclosure concerning the Fund by incorporating by reference into the Prospectus and/or

SPD all of AIG's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange

Act.

35.    **The Duty to Investigate and Monitor Investment Alternatives.**  With respect

to a pension plan such as the Plans, the duties of loyalty and prudence also entail a duty to

conduct an independent investigation into, and continually to monitor, the merits of the

investment alternatives in the Plans including employer securities, to ensure that each investment

is a suitable option for the Plans.

36.    **The Duty to Monitor Appointed Fiduciaries.**  Fiduciaries who have the

responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus

appointed.  The duty to monitor entails both giving information to and reviewing the actions of

the appointed fiduciaries.  In 401(k) plans such as the Plans, the monitoring fiduciaries must

therefore ensure that the appointed fiduciaries:

(a)    possess the needed credentials and experience, or use qualified advisors

and service providers to fulfill their duties;

(b)    are knowledgeable about the operations of the Plans, the goals of the Plans

and the behavior of the Plans' Participants;

(c)    are provided with adequate financial resources to do their jobs;

(d)     have adequate information to do their jobs of overseeing the Plans' investments with respect to company stock;

(e)     have access to outside, impartial advisors when needed;

(f)     maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(g)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

37.     **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

38.     **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

13

(2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

39.    **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VII.   PARTICIPANTS ARE NOT RESPONSIBLE FOR THE PLANS' IMPRUDENT INVESTMENTS

40.    The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case.  Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

(a)    they disclose in advance the intent to shift liability to Participants;

(b)    they designate the Plans as "404(c)" plans and adequately communicate this to Participants;

(c)    they ensure that Participants are not subject to undue influence;

(d)    they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

(e)    they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice: they can disclose all material information to Participants, including information that they are not required to disclose under the

14

securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).  Here, on information and belief, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the SPD and/or Plan Prospectus all of AIG's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act.

41.    Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

## VIII.  SUBSTANTIVE ALLEGATIONS

42.    Sub-prime mortgages are residential home loans extended to borrowers who fail to meet certain underwriting guidelines due to inadequate income, assets or credit. Sub-prime loans bear higher interest rates due to a higher risk of default.

43.    AIG both invested in and sold collateralized debt obligations ("CDO"), a debt security which, in the present context, was collateralized by a portfolio of sub-prime residential mortgages.  The value of these CDOs depends, in part, on homeowners making regular mortgage payments.

44.    AIG also issued credit protection on certain CDOs in the form of "credit default swaps" ("CDSs") which were used by investors to hedge their risk exposure on CDOs.  Through these CDSs, AIG agreed to assume the risk of nonpayment on the CDOs in exchange for a fee. In the event of default, AIG was obligated to compensate the purchaser of the CDS for the amount in default. The value of a CDS depends on the quality and value of the underlying CDO and the collateral securing the obligations underlying the CDO.

45.    AIG also wrote "puts" on certain CDOs.  Under the terms of these puts, generally, AIG could be obligated to repurchase certain CDOs, at the initial issue offering price, even if the CDO fell in value below that price.

46.    AIG consistently misrepresented and failed to disclose its exposure to the sub-prime mortgage market throughout the Class Period.  On May 10, 2007 AIG filed a Form 10-Q with the Securities and Exchange Commission ("SEC") which reported quarterly net income of $4.13 billion.  In that 10-Q, AIG represented the following:

> **Many of [AIG subsidiary] AGF's borrowers are non-prime or sub-prime.** Current economic conditions, such as interest rate and employment, have a direct effect on the borrowers' ability to repay these loans.  AGF manages the credit risk inherent in its portfolio by using credit scoring models at the time of credit applications, established underwriting criteria, and in certain cases, individual loan reviews.  AGF's Credit Strategy and Policy Committee monitors the quality of the finance receivables portfolio on a monthly basis when determining the appropriate level of the allowance for losses.  The Credit Strategy and Policy Committee bases its conclusions on quantitative analyses, qualitative factors, current economic conditions and trends, and each committee member's experience in the consumer finance industry.  **Through the first three months of 2006, the credit quality of AGF's finance receivables continues to be strong.**  However, declines in the strength of the U.S. housing market or economy may adversely affect the future credit quality of these receivables. [emphasis added]

47.    On August 8, 2007, AIG filed a Form 10-Q with the SEC that reported quarterly net income of $4.28 billion.  In that 10-Q, AIG represented the following:

> The U.S. residential mortgage market is experiencing serious disruption due to deterioration in the credit quality of loans originated to non-prime and subprime borrowers, evolving changes in the regulatory environment and a slower residential housing market.  AIG participates in the U.S. residential mortgage market in several ways: American General Finance, Inc. (AGF) extends first and second-lien mortgage loans to buyers and owners of residential housing; United Guaranty Corporation (UGC) provides mortgage guaranty insurance for first and second-lien residential mortgages;  AIG insurance and financial services subsidiaries invest in mortgage-backed securities and collateralized debt obligations (CDOs) in which the underlying collateral is composed in whole or in part of residential mortgage loans;

16

and AIGFP provides credit protection through credit default swaps on certain senior tranches of such CDOs. The operating results of AIG's consumer finance and mortgage guaranty operations in the United States have been and are likely to continue to be adversely affected by the factors referred to above. The downward cycle in the U.S. housing market is not expected to improve until residential inventories return to a more normal level and the mortgage credit market stabilizes. AIG expects that this downward cycle will continue to adversely affect UGC's operating results for the foreseeable future, although UGC is beginning to experience improved credit quality trends on new production. **The effect of the downward cycle in the U.S. housing market on AIG's other operations, investment portfolio and overall consolidated financial position, is not expected to be material due to AIG's disciplined underwriting and active risk management, as well as the high credit ratings for assets collateralized by subprime and non-prime mortgages and the structural protections against loss afforded AIG by its senior position in the investments and exposures that it holds**. [emphasis added]

48.     Both before and during the Class Period, several financial institutions experienced significant financial losses associated with the United States residential sub-prime mortgage market generally, and CDOs tied to that market in particular. Addressing AIG's potential exposure to this financial crisis, in a Form 8-K filed with the SEC on August 8, 2007, AIG represented:

> We continue to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call, which will be available in the investor information section of AIG's website tomorrow morning at 7:30 a.m."

49.     During the presentation referenced in that August 8, 2007, Form 8-K, Defendants stated:

> AIGFP's [AIG Financial Products Corp.] exposure to the [sub-prime mortgage] market is derived through two sources. First, they write extremely risk-remote super senior or AAA-plus credit protection on highly diversified pool of assets, some of which include residential mortgages. Second, they are cash investors in highly-rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages.

17

While both of these activities involve significant notional exposure, the risk actually undertaken is very modest and remote, and has been structured and managed effectively. AIGFP has been running a successful business of writing super senior credit default swaps, or CDS protection, since 1998. As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion. The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality. **Before AIGFP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.**

\* \* \*

[W]ith super senior protection, we're talking about a very remote risk, which is defined and calculated not just by rating agency models, but also by our own very rigorous internal models used on each deal AIG-FP structures.

\* \* \*

AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to manage these risks carefully.

\* \* \*

It is hard to get this message across but these [credit default swaps] are very much handpicked. We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points. People have been willing to work with us in order to do that, to create the value that they do in these underlying [sic.]. **So the combination of the diversity, the combination of the underlying credit quality, and then the stresses that we put it through -- to make sure that we can hit these marks -- it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions.**

\* \* \*

We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. But we see no issues at all emerging. **We see no dollar of loss associated with any of that [credit default swap] business. Any reasonable scenario that anyone can draw, and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.** [emphasis added]

50.    On November 7, 2007, AIG filed a Form 10-Q with the SEC that reported

quarterly net income of $3.09 billion. At this time, AIG reported a small loss of only $352

18

million for the third quarter in its credit default swap portfolio and projected a fourth quarter loss of only $550 million.

51.    In a Form 8-K also filed with the SEC on November 7, 2007, AIG reported:

Commenting on the third quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "In a volatile market environment that challenged many financial institutions, AIG reported adjusted net income of $3.49 billion in the third quarter of 2007 and increased book value per share to $40.81, once again confirming the benefits of our diversified portfolio of global businesses. While U.S. residential mortgage and credit market conditions adversely affected our results, our active and strong risk management processes helped contain the exposure. Our balance sheet remains strong with the financial resources to weather continued uncertainty as well as to take advantage of attractive market opportunities as they emerge.

\* \* \*

"Our Mortgage Guaranty business reported an operating loss in the quarter resulting from the continued deterioration in the U.S. housing market. American General Finance's adherence to disciplined underwriting standards has helped maintain the credit quality of its real estate portfolio. AIGFP reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio. **Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives**. [emphasis added]

52.    On December 7, 2007, AIG filed a Form 8-K/A with the SEC which stated:

AIG noted that the ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since October 31, 2007 is approximately $500 million to $600 million as of November 30, 2007, or an aggregate of approximately $1.05 billion to $1.15 billion since September 30, 2007. The fair value of these derivatives is expected to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates. **AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives**. [emphasis added]

53.     During the December 5, 2007 investor conference referenced in the December 7, 2008

Form 8-K/A, Defendants represented the following:

> AIGFP's models through the 2005 vintages have proven to be very reliable and when coupled with their conservatively structured transactions provide AIG with a very high level of comfort. AIGFP's attachment points are higher than worst-case modeled scenarios. In addition, by being at the top of the structure in most instances, AIGFP controls the CDOs and ultimately, the collateral.
>
> \* \* \*
>
> AIG does not rely on asset-backed commercial paper or the securitization markets responding and importantly, we have the ability to hold devalued investments to recovery. That's very important. It is still difficult to distill exposures to the U.S. residential housing market to one number given the varying nature of exposures across our various businesses in this sector. As you can see from this slide, AIGFP has very large notional amounts of exposure related to its Super Senior credit derivative portfolio. But because this business is carefully underwritten and structured with very high attachment points to the multiples of expected losses, **we believe the probability that it will sustain an economic loss is close to zero.** [emphasis added]
>
> \* \* \*
>
> Now at the end of the day, what is the bottom line? And, what should you take away from today's discussions? First of all that AIG has accurately identified all areas of exposure to the U.S. residential housing market, second, we are confident in our marks and the reasonableness of our valuation methods. We cannot predict the future, but we have in what we -- what we have, a high degree of certainty in what we have booked to date. Thirdly, AIG's exposure levels are manageable, given our size, financial strength and global diversification. Fourth, AIG is fortunate to have a diverse portfolio of leading businesses with tremendous earnings power.

54.     On February 11, 2008, AIG filed a Form 8-K with the SEC which admitted that

the decline in the value of its CDS portfolio through November 30, 2007 was $5.96 billion, more

than $4 billion more than previously reported. AIG further admitted:

> AIG has been advised by its independent auditors, PricewaterhouseCoopers LLC, that they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio. AIG's assessment of its internal controls relating to the fair value valuation of the AIGFP super senior credit default swap portfolio is ongoing, but AIG believes that it currently has in place the necessary compensating controls and procedures to

appropriately determine the fair value of AIGFP's super senior credit default swap portfolio for purposes of AIG's year-end financial statements.

55.    On February 28, 2008, AIG filed a Form 10-K with the SEC which revealed that AIG's credit default swap portfolio had declined in value by $11.5 billion resulting in a record quarterly loss for AIG of $5.3 billion.

56.    The February 28, 2008, 10-K effectively conceded that the methods it had previously used to reduce the Company's reported losses were improper.  Specifically, AIG conceded that it did not have a basis to apply $3.63 billion in "negative basis adjustments" previously used in its December 2007 disclosures to reduce reported loss in value of the credit default swap portfolio.

57.    The February 28, 2008, 10-K also disclosed, for the first time, that AIG's credit default swap portfolio included $6.5 billion in liquidity "puts" written on CDOs linked to the sub-prime mortgage market.  These put agreements required AIG to purchase certain CDOs at par, provided the securities did not suffer a default.  These put agreements represented substantial near-term liabilities.

58.    The February 28, 2008, 10-K included a copy of AIG's internal auditor's "material weaknesses" letter:

> Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

59.    The February 28, 2008 Form 10-K further stated:

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified. As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective.

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting. AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial and the preparation of AIG's financial statements for external purposes in accordance with GAAP.

\* \* \*

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective. AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual, or interim consolidated financial statements that would not be prevented or detected on a timely basis.

60.    On May 8, 2008, AIG filed a Form 8-K with the SEC which reported:

American International Group, Inc. (AIG) today reported that the continuation of the weak U.S. housing market, the disruption in the credit markets, as well as equity market volatility, had a substantial adverse effect on its results for the first quarter ended March 31, 2008. These factors were primarily responsible for AIG

22

incurring a **net loss for the first quarter of 2008 of $7.81 billion** or $3.09 per diluted share. The net loss, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. For the 2007 first quarter, in which none of these external conditions existed in a material fashion, AIG reported net income of $4.13 billion or $1.58 per diluted share. First quarter 2008 adjusted net loss, as defined below, was $3.56 billion or $1.41 per diluted share, compared to adjusted net income of $4.39 billion or $1.68 per diluted share for the first quarter of 2007.

\* \* \*

First quarter 2008 results included pre-tax net realized capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges in AIG's investment portfolio. This compares to pre-tax net realized capital losses of $70 million ($56 million after tax) in the first quarter of 2007. **The 2008 other-than-temporary impairment charges resulted primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary.** [emphasis added]

61.    On June 27, 2008, AIG announced as much as another $5 billion in losses arising out of investments of its insurance unit in sub-prime mortgage assets.

62.    From the fourth quarter of 2007 to the second quarter of 2008, AIG wrote down approximately **$38 billion** relating to its CDOs and sub-prime investments.

63.    Defendants' statements were materially false and misleading, for at least the following reasons in that Defendants:

(a)    misrepresented or failed to disclose the losses associated with AIG's CDS and CDO portfolio;

(b)    misrepresented or failed to disclose the true extent of AIG's financial exposure to the sub-prime mortgage market;

23

(c)      misrepresented or failed to disclose material weaknesses in the internal controls concerning financial reporting and oversight relating to the fair value valuations of AIG's CDS portfolio.

64.      As a result of Defendants' material misrepresentations and failures to disclose as set forth above, the prices of AIG common stock and Fund shares were artificially inflated throughout the Class Period.

## IX.  CAUSES OF ACTION

### A.      Count I: Failure to Prudently and Loyally Manage the Plans and Assets of the Plans

65.      Plaintiffs incorporate by reference the paragraphs above.

66.      This Count alleges fiduciary breach against all Defendants other than the Director Defendants  (the "Prudence Defendants").

67.      As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

68.      As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plans for the sole and exclusive benefit of the Plans' Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plans and directing the trustee regarding the same, evaluating the

24

merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

69.     Yet, contrary to their duties and obligations under the plan documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plans, but was, instead, an imprudent investment in light of the Company's material undisclosed fundamental weaknesses.

70.     Nonetheless, during the Class Period, these Defendants continued to permit the Plans to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plans to invest those contributions in the Fund and permit the Fund to invest in Company stock. They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares were artificially inflated.

71.     The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

72.     The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but had no such procedure. Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund. Such an investigation would have revealed to a reasonably prudent

25

fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

73.     The Prudence Defendants breached their fiduciary duty respecting the Plans' investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

74.     The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

75.     According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the Plans' investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

76.     According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

(a)     A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the Plans' portfolio with respect to which the fiduciary has investment duties), to further the purposes of the Plans, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)     Consideration of the following factors as they relate to such portion of the portfolio:

(i)     The composition of the portfolio with regard to diversification;

(ii)     The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the Plans; and

(iii)     The projected return of the portfolio relative to the funding objectives of the Plans.

77.     Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Company stock because, among other reasons:

(a)     The Prudence Defendants knew of and/or failed to investigate the failures of the Company as alleged above.

(b)     The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

78.    This abnormal investment risk could not have been known by the Plans'

Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the

market generally, because the fiduciaries never disclosed it.

79.    Knowing of this extraordinary risk, and knowing the Participants did not know it,

the Prudence Defendants had a duty to avoid permitting the Plans or any Participant from

investing the Plans' assets in the Fund or Company stock.

80.    Further, knowing that the Plans were not adequately diversified, but were heavily

invested in Company stock, the Prudence Defendants had a heightened responsibility to divest

the Plans of Company stock if it became or remained imprudent.

81.    The Prudence Defendants breached their fiduciary duties by, inter alia, failing to

engage independent advisors who could make independent judgments concerning the Plans'

investment in the Company; failing to notify appropriate federal agencies, including the DOL, of

the facts and circumstances that made Company stock an unsuitable investment for the Plans;

failing to take such other steps as were necessary to ensure that Participants' interests were

loyally and prudently served; with respect to each of these above failures, doing so in order to

avoid adversely impacting their own compensation or drawing attention to the Company's

inappropriate practices; and by otherwise placing their own and the Company's improper interests

above the interests of the Participants with respect to the Plans' investment in Company stock.

82.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged

in this Count, the Plans suffered tremendous losses.  If the Prudence Defendants had discharged

their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would

have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of

fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

83.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II:  Failure to Provide Complete and Accurate Information to Participants and Beneficiaries**

84.    Plaintiffs incorporate by reference the allegations above.

85.    This Count alleges fiduciary breach against all Defendants other than the Director Defendants (the "Communications Defendants").

86.    As alleged above, during the Class Period the Communications Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

87.    As alleged above, the scope of the Communications Defendants' duties included disseminating Plan documents and/or Plan-related information to Participants regarding the Plans and/or assets of the Plans.

88.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans. This duty to inform Participants includes an obligation to provide Participants and beneficiaries

of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all the Plans' investment options, including investment in Company stock.

89.    This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Communications Defendants facilitated the illegal conduct in the first instance.

90.    The Communication Defendants were obligated to provide Participants with complete and accurate information concerning all of the Plans' assets. However, their duties of honest disclosure were especially significant with respect to Company stock because: a) during the Class Period, a large percentage of the Plans' assets were invested in it; b) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and c) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

91.    The Communications Defendants breached their ERISA duty to inform Participants by failing to provide complete and accurate information regarding the Company and Company stock as alleged above, and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, and the prudence of investing retirement contributions in the stock.

30

92.     In particular, the Committee Defendants were responsible for communications made in the official plan documents and materials which were disseminated directly to all participants to be used by participants in the management of the investment of their individual accounts in the Fund, including the SPD and Prospectus which, on information and belief, incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports.

93.     These failures were particularly devastating to the Plans and the Participants, as a significant percentage of the Plans' assets were invested in Company stock during the Class Period, with acquisitions of Company stock occurring at significantly inflated prices. Thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets. Had such disclosures been made to Participants, or the Plans' fiduciaries, if any, who were not aware of facts alleged herein, Participants and fiduciaries could have taken action to protect the Plans, and the disclosure to Participants, which necessarily would have been accompanied by disclosure to the market, would have assured that any further acquisitions of Company stock by the Plans would have occurred at an appropriate price.

94.     As a consequence of the failure of the Communications Defendants to satisfy their duty to provide complete and accurate information under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Company stock, or to appreciate that under the circumstances known or that should have been known to the Communications Defendants, but not known by Participants, Company stock was an inherently unsuitable and inappropriate investment option for their individual accounts.

95.    The Communications Defendants' failure to provide complete and accurate information regarding Company stock was uniform and plan-wide, and impacted all Participants the same way in that none of the Participants received crucial, material information regarding the risks of Company stock as a plan investment option and all of the Plans' acquisitions of employer stock during the Class Period occurred at inflated prices.

96.    As a consequence of the Communications Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Communications Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

97.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Communications Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Failure to Monitor Fiduciaries**

98.    Plaintiffs incorporate by reference the allegations above.

99.    This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

100.    As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

32

1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

101.    As alleged above, the scope of the fiduciary responsibilities of the Director Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of the Committee Defendants.

102.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

103.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to participants or for deciding whether to retain or remove them.

104.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plans and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

33

105.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

(b)   failing to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Company stock;

(c)   to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in the Fund; and

(d)   failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Fund despite the practices that rendered Company stock an imprudent investment during the Class Period.

106.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

107.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**D.    Count IV: Co-Fiduciary Liability**

108.    Plaintiffs incorporate by reference the allegations above.

109.    This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

110.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

111.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

112.    Knowledge of a Breach and Failure to Remedy.  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less

reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

113.    In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

114.    Knowing Participation in a Breach. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same Plans if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties. Moreover, as alleged above, each of the Defendants participated in the management of the Plans' improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

115.    Enabling a Breach. ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

116.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

117.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other Participants and beneficiaries, lost millions of dollars of retirement savings.

118.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## X.  CAUSATION

119.    The Plans suffered millions of dollars in losses of vested benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

120.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plans of Company stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that it suffered.

## XI.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

121.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plans' assets should not have been invested in the Fund during the Class Period.

122.    As a consequence of the Defendants' breaches, the Plans suffered a significant loss of vested benefits.

123.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan....".  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate....".

124.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:

(a)    a monetary payment to the Plans to make good to the Plans the loss of vested benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)    reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

38

(d)      taxable costs and interest on these amounts, as provided by law; and

(e)      such other legal or equitable relief as may be just and proper.

## XII.  CLASS ACTION ALLEGATIONS

125.    Class Definition.  Plaintiffs bring this action as a class action pursuant to Rules

23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and

the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the
> Plans at any time between May 10, 2007 and the present, and whose accounts
> included investments in AIG stock.

126.    Class Period.  The fiduciaries of the Plans knew or should have known at least by

May 10, 2007 that the Company's material weaknesses were so pervasive that Company stock

could no longer be offered as a prudent investment for retirement Plans.

127.    Numerosity.  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at

this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are,

based on the AIG Plan's Form 5500 Annual Return filed with the Internal Revenue Service

("IRS") and dated October 11, 2007, more than 42,000 members of the Class who participated in,

or were beneficiaries of, the Plans during the Class Period.

128.    Commonality.  Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(a)      whether Defendants each owed a fiduciary duty to Plaintiffs and members

of the Class;

39

(b)     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Plans suffered losses and, if so, what is the proper measure of damages.

129.    Typicality. Plaintiffs' claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claims on behalf of the Plans are not only typical of, but identical to claims under this section brought by any Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

130.    Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

131.    Rule 23(b)(1)(B) Requirements. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

40

132.    Other Rule 23(b) Requirements.  Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the Plans' assets; and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

41

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Company stock;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.


Dated: July 18, 2008                            **PLAINTIFFS,**


                                                By _____
                                                **SARRAF GENTILE LLP**
                                                Ronen Sarraf
                                                Joseph Gentile
                                                11 Hanover Square
                                                New York, NY 10005
                                                Telephone: (212) 868-3610
                                                Facsimile: (212) 918-7967
                                                ronen@sarrafgentile.com
                                                joseph@sarrafgentile.com

Robert A. Izard
William Bernarduc
**IZARD NOBEL LLP**
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290
rizard@izardnobel.com
wbernarduci@izardnobel.com

**MAJOR KHAN LLC**
Major Khan
20 Bellevue Terrace
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

Attorneys for Plaintiffs and the Class